# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MARK RUSSELL,

        Petitioner,

                          **CASE NO. 2:08-CV-171**

   v.                         **JUDGE SARGUS**

                              **MAGISTRATE JUDGE KING**

WANZA JACKSON, Warden,

        Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This action involves petitioner's convictions following a jury trial in the Franklin County Court of Common Pleas for murder with a firearm specification. The trial court sentenced petitioner to fifteen years to life imprisonment, plus three years on the firearm specification. Petitioner's convictions were affirmed by the Ohio Tenth District Court of Appeals and the Ohio Supreme Court and, although petitioner pursued additional state court challenges to his convictions, none of those actions met with success. This matter is now before the Court on the petition, petitioner's supplemental memoranda in support and supplemental exhibits, respondent's return of writ, petitioner's traverse and the exhibits of the parties. For the reasons that follow, the Magistrate Judge concludes that petitioner's claims are procedurally defaulted or without merit and therefore **RECOMMENDS** that this action be **DISMISSED.**

# PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural

history of this case as follows:

> On the afternoon of August 11, 2000, the victim in this case, Kenny Sartin, was found dead at the wheel of an idling car stopped on a quiet residential street in northwest Columbus with a crack pipe in his lap and a bullet hole behind his right ear. A short-barreled .38 revolver lay on the floorboards of the car. Appellant was taken into custody at the scene and never denied that he had spent much of the preceding day socializing with the victim at several motels not far from the crime scene, that he had left as a passenger in the victim's car, and that he had been in the vicinity at the time of the shooting. Appellant was not charged with Sartin's death, however, until 14 months later, after having given conflicting accounts to investigating officers regarding events surrounding the shooting.

> At trial, the state presented the testimony of Tyrone Woods, an acquaintance of both the victim and appellant who spent time with them in the days preceding the shooting. Woods testified that on the morning of August 11, 2000, he went to visit his uncle in a room at the Suburban Lodge on State Route 161. While he was there, he received a call from his friend Kenny Sartin asking him to go to the Motel 6, also on State Route 161, so that Sartin could buy crack cocaine from Woods. Woods then returned to his uncle's room at the Suburban Lodge to drink and smoke marijuana. Around 2:00 p.m., Woods received another call to return to Kenny's room. While there, he observed appellant and an individual known as "Chello" pull into the Motel 6 parking lot in a gray Honda Accord. After leaving, Woods received yet another phone call from a friend named Yashir staying at the Suburban Lodge. Yashir said that appellant was in a room across the hall being disruptive and would not leave, and asking Woods to come and persuade appellant to leave the area.

> When Woods arrived, he found appellant, Chello, Yashir, and

Sartin, among others, in the room, and they went out to the parking lot. Sartin was preparing to give Woods $50 he owed for crack cocaine when appellant became upset, saying that it was rightfully his money. Woods observed that appellant had a gun hanging out of his pocket, and Woods told him to cover it up so that it would not show. There was more bickering regarding the debt, and Woods decided to leave. At this point, appellant asked Woods to take the gun with him, but Woods refused and left with Chello and Yashir.

Woods testified that later that evening, appellant came to his house just before 11:00 p.m. and announced that Kenny Sartin was dead. The two then watched the late news on television and immediately Woods saw footage of the car that he had seen appellant and Sartin driving earlier. As they watched the news story, appellant described leaving the Suburban Lodge with Sartin and an individual known as Casper, and that at some point, the car pulled over and appellant got out, leaving Sartin and Casper in the car. Appellant stated to Woods that he then heard a pop and saw Casper running away. Woods testified that although he had not seen anyone named Casper or fitting his description during the morning or afternoon of August 11, 2000, he was, at the time, inclined to believe the story because appellant and Sartin were generally friendly despite the day's argument over the $50 debt.

Woods specifically testified that the gun recovered from the crime scene and presented as evidence in the case resembled the gun he had seen earlier in appellant's possession. He further testified that other persons partying at the motels in question had stated that appellant had been drinking and smoking crack for three days straight, although Woods did not personally observe this. Woods had seen appellant drinking alcohol on the day of the shooting, and knew that appellant possessed crack and felt that he was probably smoking it, although he did not directly observe that.

Another acquaintance of appellant and the victim, Marchello Cox, testified for the prosecution. He stated that he was the

"Chello" identified in previous testimony. He testified, like Woods, that he saw both appellant and Kenny Sartin on August 11, 2000, at motels on State Route 161. Cox testified that he was taking drugs to the motel to sell to Kenny Sartin, and that appellant was driving him. After selling drugs to Sartin, they went to the Motel 6 and drank in Sartin's room with appellant and Woods. Later he ran with appellant to the Suburban Lodge to deliver more drugs.

On the morning of the 11th, Cox gave appellant $20 because appellant said he was tired, and Cox told him to go home and get some rest. Cox stated that he knew appellant was tired because they had been up all night drinking, but that he had not personally observed appellant taking cocaine. On the afternoon of the 11th, Cox returned to the Suburban Lodge and again saw appellant and Sartin there. At this time, Cox saw the handle of appellant's gun sticking out of his pants. Cox also identified the holster submitted as evidence by the state as resembling the one he saw on appellant's person that day. When Cox left the motel parking lot on the afternoon of the 11th, appellant and Kenny Sartin were still in the parking lot, and they appeared to be having a disagreement. Cox stated that he had known Kenny Sartin approximately two years at the time of his death, and that he had never known Sartin to carry a gun.

The state presented several eyewitnesses to events surrounding the discovery of the victim's body at the wheel of his car. Michael Magora testified that about 3:15 p.m. on August 11, 2000, he was driving his daughter to a pitching clinic when he noticed a car in the area of Sandalwood Boulevard and Redwood Road. The passenger door was open and an individual, who appeared confused, was walking into the street near the vehicle. Mr. Magora could not see anyone else in the car. Mr. Magora was not asked to make a positive identification of appellant as the person he had seen walking in the vicinity of the vehicle.

Nathan Rich testified for the prosecution that he was leaving

a group home he managed on Redwood Road in the vicinity of Sandalwood Boulevard when he saw a man attempting to flag down vehicles. The defense stipulated that this man seen by Rich was appellant. Appellant got in front of Rich's vehicle, and when Rich stopped, appellant opened the passenger side door and got into the car. Appellant appeared to Rich to be acting rather erratically and high, as though as on a stimulant. Appellant seemed eager to leave the area, and told Rich that appellant's buddy was "really drunk" and appellant wanted to leave immediately. Rich became concerned for his own safety both because of appellant's behavior and because Rich could see an apparently lifeless person in the driver's seat of the stopped vehicle. Rich told appellant that he could not drive him any further and, instead, returned to his near-by place of work and remained in the car in the driveway for a short while pleading with appellant to leave the vehicle and convincing appellant that he could use the phone in the group home. Appellant appeared to attempt to make two phone calls but was unable to complete them and left on foot. As appellant left, he again pleaded with Rich to give him a ride but Rich again refused.

Cheryl Drissen was another prosecution witness describing the scene at the discovery of the victim's body. She was visiting her parents on Sandalwood Boulevard when a woman came to the door and said she had been riding a bike with her children and seen an individual in a car who appeared to be sick. After Ms. Drissen looked in the car, she called 911. At this time, a man, later identified as appellant, came running towards her from a house on the opposite corner and asked her, "did you call 911?" Ms. Drissen noticed that the car was running and asked appellant to turn it off. When he refused to do so, she reached in and turned off the ignition herself. As she did so, she noticed a gun and a brown paper bag on the floor of the passenger side of the vehicle and that the person occupying the driver's seat appeared dead. Appellant seemed to notice her observing the gun, and at this point became very agitated. Appellant said that he had just hitched a ride with some persons, and that when someone began acting weird in the car he had jumped out as the car pulled over. Appellant seemed distressed and was repeating, "oh God, oh God." The police arrived shortly

thereafter and handcuffed appellant. Ms. Drissen identified a police crime scene photograph showing the gun and paper bag on the floor of the car as accurately depicting what she had observed.

Officer Timothy J. Lewis of the Columbus Division of Police, testified and described his response to the crime scene. At 3:24 p.m. on August 11, 2000, he was on patrol on Sandalwood Boulevard when he was flagged down by bystanders and observed an individual apparently passed out in a car with a gun laying on the passenger side floor of the vehicle. He described the vehicle as a 1992 Honda Accord. He also noticed a glass crack pipe in the individual's lap. When Officer Lewis and his partner opened the door, he noticed that the victim was bleeding from the back of his head and was completely unresponsive. The officers ascertained that the victim was not breathing, and called for an ambulance and more units to secure the scene.

Officer Lewis and other officers then detained appellant, whom other bystanders had pointed out. Appellant appeared very nervous and was apparently intoxicated.

Officer Janel Mead of the Crime Scene Search Unit, also testified regarding the crime scene. Officer Mead testified regarding the various photographs taken of the crime scene and also identified objects recovered from the vehicle. These included two crack pipes and a .38 caliber revolver containing one spent round and three live rounds.

Detective William Gillette testified regarding the homicide investigation. He testified that, on the day of the shooting, he went to the crime scene to begin his investigation, but did not personally interview appellant after appellant was taken into custody at the scene. Another detective conducted the first interview with appellant and, based on the result of that interview in which appellant implicated another person as the shooter, appellant was released. The other individual named by appellant, Robert Heltebrake, whom appellant referred to

as "Casper," was eventually detained and interviewed. Without objection, Detective Gillette was allowed to testify that Heltebrake subsequently agreed to take a polygraph examination which he passed successfully, and that this was one reason that police did not further pursue Heltebrake as a suspect.

At a subsequent interview with Detective Gillette, appellant described the circumstances of the shooting. He stated that he was seated in Casper's car, and that Casper had left the vehicle to get into the victim's car when the shooting occurred. Because this differed in some details from what Detective Gillette had been told about appellant's first interview, he asked appellant if he would take a polygraph examination. Appellant acquiesced initially, but missed the first polygraph appointment.

Appellant subsequently contacted police stating that he had additional information regarding the shooter and would like to meet again with Detective Gillette. Detective Gillette met appellant at a restaurant and appellant indicated that he was no longer willing to take a polygraph exam. He stated that a previously unnamed person by the name of "Mook," later identified as Jesse Lanier, was responsible for the shooting.

Yet another interview occurred between Detective Gillette and appellant, this time in the tractor cab of appellant's semi-truck. At this interview, appellant stated that he had stopped hauling drugs for certain persons on his runs as a long-haul trucker, and that these persons had recently shot at him. Appellant did not identify exactly who was responsible. Appellant then stated that he knew who had killed the victim, and that appellant was not responsible.

Detective Gillette subsequently interviewed Jesse Lanier, and based on the results of that interview, again interviewed appellant. At this interview, appellant returned to his story that "Casper" was responsible. When told that Heltebrake had been interviewed and passed the polygraph test, appellant

asserted that "Casper" must have a twin brother, because he was there at the shooting. The detective also advised appellant that Heltebrake's prints had not been found in the car, only the victim's and appellant's prints. At this time, appellant stated that the victim had stolen an ATM card and was using the card to steal money from the owner's account, and that this had possibly led to the shooting.

When Detective Gillette confronted appellant with witness accounts that identified the gun and holster found in the car as those in his possession earlier in the day at the motel, appellant not having the gun on his person that day, stated only that he had had a different weapon on his person the day before [sic]. Appellant then indicated that he was once more interested in taking a polygraph test and a time was arranged for him to do so, but appellant once again did not show for his polygraph appointment.

At yet another interview in which Detective Gillette was speaking with appellant's live-in girlfriend, appellant arrived in the middle of the interview and offered yet another version of the shooting to Detective Gillette. He indicated this time that Marchello Cox was responsible for the shooting, but that Casper was there as well.

At a subsequent interview on September 17, 2002, appellant gave yet another version of the shooting. On this occasion, he stated that he and Sartin had just purchased some crack cocaine in the vicinity of Karl Road and Robinwood Drive, and while Sartin drove to Sandalwood Boulevard with appellant in the car, appellant smoked crack cocaine. Sartin then pulled over the car on Sandalwood Boulevard and appellant handed the crack pipe to him. After the crack pipe returned to appellant and he recommenced smoking, he noticed Sartin playing with a handgun. Sartin pointed the gun at appellant and appellant pushed the barrel away with his hand, whereupon the gun accidentally discharged and killed Sartin.

After this lengthy series of interviews with appellant, Detective

Gillette was ultimately able to arrange for appellant to take a polygraph test. The results indicated that appellant was not being truthful about his description of events on the day of the shooting.

On circumstantial issues, Detective Gillette also testified that subsequent investigation determined that the automobile driven by the victim on the day in question had been reported as stolen. A bullet recovered during the victim's autopsy was a ballistic match for the handgun recovered at the scene.

Dr. Patrick Fardal, Chief Forensic Pathologist for the Franklin County Coroner's Office, testified regarding his examination of the victim's body. He described the victim as having no injuries other than a single gunshot wound entering behind the right ear, traversing the brain and coming to rest in the left frontal area, indicating a direction of travel from behind the victim to the left and slightly upwards. The presence of gunpowder residue inside the skull and on the outer brain membrane indicated with a high degree of certainty that the bullet wound occurred from a contact wound, with the gun muzzle pressed against the victim's skin.

The victim suffered no other visible conditions contributing to his death. The toxicology results indicated a low level of alcohol, and moderate levels of cocaine and cocaine metabolite, roughly the equivalent of four episodes of usage over a period of four to eight hours.

Brian D. Reigle of the Ohio State Highway Patrol, testified regarding administration of the polygraph exam to appellant. Appellant was asked four specific questions regarding the circumstances surrounding the shooting. For each question covering his participation in the shooting, appellant's denials were recorded as deceptive on the polygraph examination.

Appellant testified on his own behalf. Appellant stated that he had known the victim since 1981. On the day of the shooting,

appellant had been riding with the victim, who had offered to give appellant a ride home but indicated that he first wished to stop and buy some crack cocaine. As they turned onto Sandalwood Boulevard, they encountered a car driven by Robert "Casper" Heltebrake. Appellant got out of the car so that Heltebreak could get in and sell the victim some crack. Heltebreak gave the victim a porcelain pipe and, after the victim smoked some crack, an argument broke out. Appellant heard a shot and saw Heltebrake get out of the car and leave.

Appellant then flagged down the various bystanders and attempted to make a call to 911, but could not get the phone to work properly. He ran to another bystander and ask her to dial 911, which she did. This woman then asked appellant to open the door and turn the victim's car engine off, and he refused because he did not wish to disturb the crime scene. Police handcuffed appellant upon arrival and took him to police headquarters where he was interviewed by police. He told them what had happened and volunteered to take a gun powder residue test. He was told that the gun powder residue test was negative and he was released.

Appellant further testified that he took the lie detector test after he was arrested 14 months after the crime. He took the test under coercion from his counsel, who also told him that he should abandon his story that Heltebrake was responsible for the shooting, and tell the police that the shooting was accidental. Appellant then retained new counsel and reverted to his original, truthful version of events in which Heltebrake shot Sartin.

Appellant's direct testimony at trial was that he had not killed the victim, whom he described as a friend, and had never told anyone that anyone other than Heltebrake was responsible. On cross-examination, the prosecution attempted to impeach appellant with Detective Gillette's accounts of his previous recorded interviews, in which appellant implicated Jesse Lanier and Marchello Cox. Appellant continued to assert that he had never told investigating detectives that anyone other

than Heltebrake had committed the shooting. He stated that Detective Gillette was the one who kept bringing up other names in interviews and that appellant had always denied that other persons were involved.

Appellant did admit that, at one point, he had told the detective that the shooting was accidental, and that he had written a letter to the victim's mother indicating that the shooting was accidental. He stated that he wrote this letter because of pressure from his then-counsel, who indicated that the accident story would produce a more favorable outcome than continuing to assert that Heltebrake was the shooter.

No other significant testimony was presented by the defense. At the close of evidence, the prosecution successfully objected to the defense's attempt to introduce the video and audio tape recordings of appellant's police interviews into evidence.

The jury returned a verdict of guilty and appellant was sentenced to a term of 15 years to life, with an additional three years on the firearm specification.

*State v. Russell,* 2004 WL 1109834 (Ohio App. 10th Dist. May 6, 2004).[1]  Petitioner filed a

timely appeal.  He asserted the following assignments of error:

ASSIGNMENT OF ERROR NUMBER ONE

THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW THE TAPE RECORDED INTERVIEWS BETWEEN THE DEFENDANT AND THE DETECTIVE INTO EVIDENCE

---

[1] Petitioner disputes the factual findings of the state appellate court.  *Traverse*, at 1-14. However, this Court has reviewed the entire record and concludes that the findings of the state appellate court accurately summarize the evidence that was submitted at trial.  *See Trial Transcript.*  Further, this Court is not persuaded, upon review of the trial transcripts, by petitioner's contention that the findings of the state appellate court are unreasonable or not supported by the record.

WHEN BOTH THE DETECTIVE AND THE DEFENDANT
TESTIFIED AND THERE WERE MAJOR CONFLICTS IN
THEIR TESTIMONY WITH RESPECT TO WHAT WAS SAID
DURING THESE INTERVIEWS.

ASSIGNMENT OF ERROR NUMBER TWO

THERE WERE NUMEROUS ERRORS IN THE
INTRODUCTION OF THE EVIDENCE THAT PREVENTED
THE DEFENDANT FROM RECEIVING A FAIR TRIAL. MOST
OF THE ERRORS WERE NOT OBJECTED TO BUT RISE TO
THE LEVEL OF PLAIN ERROR, EITHER INDIVIDUALLY OR
COLLECTIVELY, AND THE DEFENDANT WAS DENIED
THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO
COUNSEL'S FAILURE TO PROPERLY OBJECT TO THESE ERRORS.

*See id.* On May 6, 2004, the appellate court affirmed the trial court's judgment. *Id.* On

September 29, 2004, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Russell*, 103 Ohio St.3d 1464 (2004).

On July 3, 2003, still represented by counsel, petitioner filed a motion for a new trial.

*Exhibit 11 to Return of Writ.*

> Appellant raised three grounds for a new trial in his motion:
> (1) improper impeachment of appellant with his prior
> inconsistent statements; (2) denial of his request to play audio
> and video tapes of his previous statements; and (3) exclusion
> of evidence. The trial court did not address appellant's motion
> until after this court affirmed appellant's conviction. The trial
> court denied appellant's motion based on res judicata, noting
> that appellant's arguments were raised or could have been
> raised in the trial court or in his direct appeal.

*State v. Russell*, 2005 WL 1869680 (Ohio App. 10th Dist. August 9, 2005).[2]  Petitioner filed a

timely appeal.  He asserted the following assignment of error:

> THE TRIAL COURT ERRED WHEN IT DENIED
> APPELLANT'S MOTION FOR NEW TRIAL WITHOUT A
> HEARING BASED ON THE DOCTRINE OF RES JUDICATA.

*See id.; Exhibit 15 to Return of Writ.*  On August 9, 2005, the appellate court affirmed the trial

court's judgment.  *Id.*  Petitioner did not timely appeal.  On November 14, 2005, petitioner

filed a motion for delayed appeal with the Ohio Supreme Court.  *Exhibits 19, 20 to Return*

*of Writ*.  On December 28, 2005, the Ohio Supreme Court denied petitioner's motion for

delayed appeal.  *State v. Russell*, 107 Ohio St.3d 1695 (2005).

> On December 12, 2005, appellant filed a second motion for new
> trial. In the motion, appellant argued that the state had failed
> to disclose, prior to trial, the identity and statement of an
> individual to whom appellant had allegedly confessed to the
> crime. On December 30, 2005, the state filed its response,
> asserting that appellant had already filed a similar motion that
> was denied by the trial court on September 29, 2004.
>
> By decision and entry filed May 3, 2006, the trial court denied
> appellant's motion for new trial. The court concluded that
> appellant's claims were barred by the doctrine of res judicata,
> as the grounds for the motion were actually raised, or could
> have been raised, in the trial court or on appeal from the
> judgment of conviction.

*State v. Russell*, 2006 WL 3411421 (Ohio App. 10th Dist. November 28, 2006).  Petitioner filed

---

[2]  Petitioner asserts that a petition for a writ of mandamus was necessary to
precipitate  a ruling by the trial court on petitioner's motion for a new trial.  *See Traverse*,
at 35; *Exhibits to Traverse.*

a timely appeal.  He asserted the following claims:

> ASSIGNMENT OF ERROR NO. 1:
>
> The State of Ohio violated the Appellant's 6th, and 14th Amendment rights by not disclosing [an] individual who [sic] the Appellant allegedly confessed to of the murder of Kenny Sartin, pursuant to Crim.R. 16.
>
> ASSIGNMENT OF ERROR NO. 2:
>
> The [T]rial Court erred when it denied defendant's motion for a new trial based on the doctrine of Res-Judicata.

*See id.*  On November 28, 2006, the appellate court affirmed the trial court's judgment.  *Id.*

On March 28, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Russell*, 113 Ohio St.3d 1444 (2007); *Exhibit 72 to Return of Writ*.

> On November 2, 2004, appellant filed a petition for post-conviction relief pursuant to R.C. 2953.21. His petition stated the following grounds for relief: (1) prosecutorial misconduct; (2) trial counsel coercion; (3) ineffective assistance of trial counsel; and (4) improper admission of evidence. The trial court denied appellant's petition without a hearing.

*State v. Russell*, 2006 WL 225278 (Ohio App. 10th Dist. January 31, 2006).  Petitioner filed a timely appeal.  He asserted as follows:

> 1. The trial court erred when it failed to hold an evidentiary hearing, and denied post-conviction petition based on the doctrine of *res judicata*.
>
> 2. The trial court denied defendant due process of law, when it ruled that the petition for post-conviction relief was untimely.

*See id.*  On January 31, 2006, the appellate court affirmed the trial court's dismissal of

petitioner's post conviction petition as untimely. *Id.* On June 7, 2006, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Russell*, 109 Ohio St.3d 1495 (2006); *Exhibit 47 to Return of Writ*.

On August 6, 2004, petitioner filed a *pro se* application to reopen his appeal pursuant to Ohio Appellate Rule 26(B). He asserted as follows:

> 1. Appellant was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Section 10 of the Constitution of the State of Ohio through counsel's failure to suppress the two summaries that were taken from appellant by Detective Gillette, when he never read appellant his Miranda rights, nor did appellant sign a waiver of his constitutional rights, knowing that this was going to be used to obtain a conviction in violation of appellant's right to counsel and against self incrimination as protected by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

> 2. The trial court erred in admitting the letter of Mark Russell in evidence as a portion of the State's case in chief.

*Exhibit 26 to Return of Writ*. On October 28, 2004, the appellate court denied petitioner's Rule 26(B) application. *Exhibit 29 to Return of Writ*. Petitioner filed an application for reconsideration. *Exhibit 30 to Return of Writ*. On November 18, 2004, the appellate court denied petitioner's application for reconsideration as untimely filed. *Exhibit 32 to Return of Writ*. On February 16, 2005, the Ohio Supreme Court dismissed petitioner's subsequent appeal as not involving any substantial constitutional question. *Exhibit 36 to Return of Writ*.

Petitioner also sought disclosure of grand jury testimony:

On January 20, 2005, defendant filed a motion to produce grand jury testimony. On November 21, 2005, the trial court denied that motion on the basis that defendant's motion failed to set forth a particularized need for the disclosure.

Defendant timely appeals from that decision and sets forth the following single assignment of error for our review: "The trial court erred by denying defendant's motion for grand jury transcripts."

Prior to the trial court entering its decision denying defendant's motion, defendant filed an original action in this court, wherein he sought a writ of procedendo ordering the respondent, the Honorable Julie Lynch, to rule on defendant's motion to produce grand jury testimony. See *State ex rel. Russell v. Lynch,* Franklin App. No. 05AP-1203, 2006-Ohio-2830. On June 6, 2006, this court denied the requested writ because the respondent demonstrated that she had performed the act which defendant sought to compel in the action. See *id.* at ¶ 13-14.

*State v. Russell, supra,* 2006 WL 3240545. On November 9, 2006, the appellate court affirmed the trial court's decision denying disclosure of grand jury testimony. *Id.* Petitioner did not timely appeal from that judgment. On March 14, 2007, the Ohio Supreme Court denied petitioner's motion for delayed appeal. *State v. Russell,* 113 Ohio St.3d 1412 (2007).

On August 24, 2007, petitioner filed a *pro se* state habeas corpus petition in the Ohio Supreme Court, asserting that the arrest warrant was issued without probable cause in violation of the Fourth Amendment, and that the complaint filed by Detective Gillette to secure his arrest warrant was deficient under the standards of Ohio Criminal Rule 3 and the 4th Amendment. *See Exhibit 77 to Return of Writ.* On October 3, 2007, the Ohio Supreme Court *sua sponte* dismissed petitioner's habeas corpus petition. *Exhibit 91 to Return of Writ.*

On February 26, 2008, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.[3] He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1. Prosecutorial misconduct in closing arguments violated petitioner's rights of due process under the 14th Amendment [o]f the United States Constitution and violated the province of the jury and DR-7 106(c)(4).

1A. Prosecutorial misconduct in closing arguments violated petitioner's 6th and 14th Amendment rights [under] the United States Constitution.

1B. Prosecutorial misconduct during opening statements, 14th Amendment violation.

1C. Prosecutorial misconduct during trial of leading questions, a 14th Amendment violation.

2. Petitioner was denied due process of law when former trial counsel Robert Suhr coerced defendant to waive his 5th Amendment rights under the United States Constitution.

2A. Attorney Keeling failed to raise in the Court of Appeals that the trial court erred in admitting the letter of Mark Russell into evidence as a portion of the State's case in chief. This violated petitioner's 6th and 14th Amendment rights.

2B. The trial court erred in admitting the letter of Mark Russell into evidence as a portion of the States's case in chief, when the prosecution knew the letter was false.

2C. Prosecutorial misconduct, the prosecution purposely mislead the defense concerning the discovery material in [its] possession in violation of petitioner's 6th and 14th Amendment

---

[3] On February 22, 2006, this Court dismissed petitioner's first federal habeas corpus petition without prejudice to re-filing. *See Russell v. Hurley,* Case Number 2:05-CV-884 (S.D. Ohio), *see Exhibits to Petition.*

rights.

3. Petitioner was denied his right to effective assistance of counsel when counsel failed to properly investigate and [conduct] pretrial discovery and failed to have scientific tests performed on the porcelain glass crack pipe in violation of his 6th Amendment [rights].

3A. Petitioner was denied effective assistance [o]f counsel when trial counsel failed to object to prosecutorial misconduct committed by the prosecutor during their opening statement, their leading questions, and in their closing arguments. Defense counsel also waived opening statements in violation of petitioner's 6th and 14th Amendment rights of the United States Constitution.

4. Attorney Keeling failed to raise in the Court of Appeals the fact that the petitioner was not given his Miranda rights, and did not sign a waiver of his constitutional rights when he was questioned by the police and the two summaries had a prejudicial effect on the case, because it denied petitioner his right to counsel and right against self incrimination.

4A. Petitioner was denied effective assistance of trial counsel when counsel allowed the State to use two unsigned and unsworn statements  for purposes other than impeachment, a violation of the 6th and 14th Amendments.

5. The trial court erred when it refused to allow the tape recorded interviews between the defendant and the detective into evidence when both the detective and the defendant testified.  There were major conflicts in their testimony with respect to what was said during those interviews.

5A. The 5th, 6th, and 14th Amendment rights of the accused were violated when the prosecution allowed their witness Det. Gillette to testify from summaries which they knew were false.

5B. The 5th, 6th, and 14th Amendment rights [o]f the accused were violated when the prosecution elicited false testimony from Detective Gillette concerning gunpowder residue.

5C.  The 5th, 6th and 14th Amendment rights of the accused were violated when the prosecution[']s witness Sgt. Brian Reigle gave false testimony concerning the accuracy of the polygraph test he performed on the accused.

6.  The improper impeachment of petitioner during the State's case in chief with his alleged inconsistent pretrial statements to police and the mischaracterization of the same during the State's closing arguments, a violation of petitioner's 5th, 6th and 14th Amendment rights.

7.  The exclusion of a letter that defendant had written to the mother of the deceased, which was needed to explain and put into context defendant's earlier letter to the mother that was introduced into evidence by the State which resulted into a 5th, 6th and 14th Amendment violation.

8.  The trial court erred when it allowed the State to introduce and admit evidence that was not admissible because the recorded part was purposely destroyed in violation of Evid. R. 106 and the 14th Amendment.

9.  The trial court erred by denying petitioner's motion requesting the grand jury transcripts, a 14th Amendment violation.

10.  The prosecution denied petitioner his constitutional rights by the non-disclosure of Crim.R. 16.  The statements and identity of the person who petitioner supposedly confessed to, of the murder of Kenny Sartin (6th and 14th Amendment violation).

11.  There were numerous errors in the introduction of the evidence that prevented petitioner from receiving a fair trial, most of the errors were not objected to, but rose to the level of plain error, either individually or collectively, and petitioner was denied effective assistance of counsel by counsel's failure to object to these errors.

11A.  Petitioner was denied effective assistance of appellate counsel when appellate counsel failed to raise on direct appeal that the trial court erred when it denied petitioner's Crim.R. 29

motion.  Petitioner's conviction is against the sufficiency and/or manifest weight of the evidence in violation of petitioner's 6th and 14th Amendment rights.

12.  Petitioner's 4th and 14th Amendment rights of the United States Constitution were violated when a warrant for his arrest was issued without probable cause, nor was the probable cause shown.

12A.  Petitioner's 4th and 14th Amendment rights of the United States Constitution were violated when the complaint filed by Detective Gillette to secure petitioner's arrest warrant was deficient, the complaint also violated Crim. R. 3.

It is the position of the respondent that petitioner's claims are procedurally defaulted or without merit.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6 (1982)(*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456

U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

In claims one, 1A, 1B, and 1C, petitioner asserts that he was denied a fair trial due to improper statements by the prosecutor during opening statements, closing arguments and at trial in the form of improper leading questions. In claim two, petitioner asserts that his attorney coerced him into waiving his 5th Amendment rights. In claim 2B, petitioner asserts that he was denied a fair trial because the trial court admitted into evidence a letter from Mark Russell which, petitioner alleges, the prosecutor knew was false. In claim 2C, petitioner asserts that the prosecutor misled the defense concerning discovery material. In claims three and 3A, and in claim 4A, petitioner asserts that he was denied the effective

assistance of trial counsel because his attorney failed to investigate the case, to conduct discovery, to arrange scientific testing of a glass crack pipe, to object to improper statements by the prosecutor during opening statement and closing argument, and to object to leading questions by the prosecutor; petitioner also asserts that his trial counsel was ineffective because his attorney waived opening statement, and allowed the prosecution to introduce petitioner's statements for purposes other than impeachment. In claim 5A, petitioner asserts that he was denied a fair trial because Detective Gillette testified from false police summaries. In claim 5B, petitioner asserts that he was denied a fair trial when the prosecutor elicited false testimony from Detective Gillette concerning gun powder residue. In claim 5C, petitioner asserts that he was denied a fair trial when Sergeant Brian Reigle testified falsely regarding the accuracy of petitioner's polygraph tests. In claim six, petitioner asserts that he was denied a fair trial due to improper impeachment with prior inconsistent statements and mischaracterization of his statements during closing argument. In claim seven, petitioner asserts he was denied a fair trial because the trial court refused to admit into evidence a letter that petitioner had written the victim's mother. In claim eight, petitioner asserts that he was denied a fair trial in connection with the introduction of allegedly impermissible evidence. In claim ten, petitioner asserts that the prosecutor improperly failed to disclose the identity of an unknown person to whom petitioner had allegedly confessed his guilt. In claims twelve and 12A, petitioner asserts that the warrant for his arrest was issued without probable cause in violation of Ohio Criminal Rules and the Fourth Amendment. Petitioner failed to

properly present any of these claims to the state courts.

To the extent that the foregoing claims are based on matters that are readily apparent from the face of the record, such claims should have been raised on direct appeal, but were not. Further, petitioner may now no longer present these claims to the state courts under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry,* 10 Ohio St.2d 175 (1967). To the extent that petitioner's claims rely on matters that are not readily apparent from the face of the record, his claims would have been properly raised in post conviction proceedings; however, the state appellate court refused to address the merits of any of petitioner's post conviction claims because they were untimely:

> R.C. 2953.21 sets forth the requirements for filing a petition for post-conviction relief. R.C. 2953.21(A)(2) provides:
>
> * * * [A] petition under division (A)(1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or, if the direct appeal involves a sentence of death, the date on which the trial transcript is filed in the supreme court. If no appeal is taken, * * * the petition shall be filed no later than one hundred eighty days after the expiration of the time for filing the appeal.
>
> Pursuant to this statute, appellant had to file his post-conviction petition no later than 180 days after August 11, 2003, the date which the trial transcript was filed in his direct appeal to this court. That date was on or around February 7, 2004. Appellant did not file his petition until November 2, 2004. Therefore, appellant's petition was untimely.
>
> A trial court lacks jurisdiction to entertain an untimely petition for post-conviction relief unless petitioner demonstrates that

one of the exceptions in R.C. 2953.23(A) applies. *State v. Lee* (June 8, 2000), Franklin App. No. 99AP-668; *State v. Raines,* Franklin App. No. 03AP-1076, 2004-Ohio-2524, at ¶ 5. Those exceptions allow a trial court to consider untimely petitions for post-conviction relief in limited situations. In this case, appellant claims the trial court should have considered his untimely petition because he was unavoidably prevented from discovering the facts upon which he relies to present his claims for relief. See R.C. 2953.23(A)(1)(a). For this exception to apply, appellant must also show by clear and convincing evidence that, but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted. R.C. 2953.23(A)(1)(b).

Appellant must demonstrate by clear and convincing evidence that he was unavoidably prevented from discovering the facts underlying his claims. *State v. Easley,* Franklin App. No. 04AP-290, 2004-Ohio-7200, at ¶ 11. Appellant did not present any evidence to the trial court to explain why he was unavoidably prevented from discovering the relevant facts underlying his petition. Although appellant now claims that he was unavoidably prevented from discovering the relevant facts because his trial counsel did not timely provide him with a trial transcript, he did not make this argument to the trial court and has waived the argument in this appeal. See *State ex rel. Quarto Mining Co. v. Foreman* (1997), 79 Ohio St.3d 78, 81 (arguments that parties raise for the first time on appeal will not be considered by an appellate court).

Even if we considered appellant's argument, the claims in his petition were all based on facts and circumstances that occurred during his trial. Appellant was present at his trial and had knowledge of all these facts and circumstances as they happened. Therefore, appellant was not unavoidably prevented from discovering those facts and circumstances merely because his attorney did not provide him with a transcript. *State v. Shackleford,* Montgomery App. No. 19965, 2004-Ohio-2431, at ¶ 9. Additionally, appellant does not even allege that, but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted. See R.C. 2953.23(A)(1)(b).

Appellant failed to establish the applicability of an exception that would allow the trial court to consider his untimely petition. Thus, the trial court lacked jurisdiction to entertain appellant's petition. *Raines,* supra. Accordingly, the trial court did not err in denying appellant's petition, although technically, the petition should have been dismissed for lack of jurisdiction. *State v. Hamilton,* Franklin App. No. 03AP-852, 2004-Ohio-2573, at ¶ 9. Further, because the trial court lacked jurisdiction to consider appellant's untimely petition, it was not required to hold an evidentiary hearing. *State v. Burke,* Franklin App. No. 02AP-677, 2002-Ohio-6840, at ¶ 19; *State v. Bryant,* Mahoning App. No. 04-MA-109, 2005-Ohio-5054, at ¶ 22.

*State v. Russell, supra*, 2006 WL 225278.

Petitioner attempted to present claims six, seven, and ten to the state courts in his first and second motions for a new trial; however, the state appellate court refused to address the merits of those claims as barred under Ohio's doctrine of *res judicata*:

Not only does *res judicata* bar appellant from raising issues that were raised in his direct appeal, it also bars issues that could have been raised in that appeal. *Szefcyk,* supra. Appellant's first and third grounds for a new trial involve alleged irregularities that occurred during his trial and are part of the trial record. Appellant cites no reason why he was prevented from raising these issues in his direct appeal to this court. Because appellant could have raised these issues in his direct appeal, they are barred by *res judicata. State v. Stark*, Montgomery App. No. 19515, 2004-Ohio-670, at ¶ 7 (affirming application of res judicata to deny defendant's claims of alleged trial error that should have been raised on direct appeal); *State v. Palmer* (Oct. 20, 1999), Belmont App. No. 96-BA-70 (affirming, on res judicata grounds, denial of motion for new trial based solely on facts within trial record). Accordingly, the trial court did not abuse its discretion when it denied appellant's motion for a new trial. The trial court also did not abuse its discretion when it denied appellant's motion without a hearing because the application of *res judicata* to appellant's claims was clear.

*State v. Russell, supra,* 2005 WL 1869680.[4]  Further, petitioner failed to file timely appeal the

appellate court's decision denying his motion for a new trial to the Ohio Supreme Court,

and the Ohio Supreme Court denied his motion for delayed appeal.  *State v. Russell, supra,*

107 Ohio St.3d 1695; *see Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004)(Ohio Supreme

Court's denial of motion for delayed appeal constitutes a procedural default of the claims

raised therein).[5]  Petitioner again attempted to present claim ten to the state courts in his

second motion for a new trial; however, the appellate court again rejected the claim as

barred under Ohio's doctrine of *res judicata.  See Exhibit 68 to Return of Writ.*

Petitioner first presented claim twelve to the Ohio Supreme Court in his state habeas

corpus petition.  *See Exhibit 77 to Return of Writ.*  However, such an action did not properly

preserve this claim for federal habeas corpus review.  *See State ex rel. Dotson v. Rogers,* 66

Ohio St.3d 25, syllabus (1993)(habeas corpus is not available to review irregularities of a

---

[4] Petitioner contends that the trial court purposely delayed issuing a ruling on his motion for a new trial until after his direct appeal had been decided and his Rule 26(B) application had been filed so that it would be impossible for petitioner to have his claims adjudicated on the merits.  *Traverse,* at 35. However, and as even petitioner acknowledges, *see id.,* at 36, petitioner's claims are barred under Ohio's doctrine of *res judicata* due to his failure to *raise* such claims on direct appeal, regardless of the date that the trial court issued its decision.

[5] Petitioner states that he was unable to mail his appeal to the Ohio Supreme Court "due to circumstances beyond his control" until September 24, 2005, because the prison was on "lock down."  *Traverse,* at 36. Petitioner also complains that he was treated unfairly because the prosecuting attorney was granted extensions of time for filing appellate briefs in the Ohio Court of Appeals, but the Ohio Supreme Court refused to grant petitioner's motion for delayed appeal.  *Id.,* at 36-37.  This Court need not address these allegations, since petitioner's claims are, in any event, waived due to his failure to properly present his claims on direct appeal or in a timely post conviction petition.

non jurisdictional nature); *State ex rel. Vinson v. Gansheimer*, 2007 WL 2822504 (Ohio App. 11th Dist. September 28, 2007)(Fourth Amendment claims not properly considered in state habeas corpus petition).[6]

In claim eleven, petitioner asserts that he was denied a fair trial due to numerous errors throughout his trial and that he was denied the effective assistance of counsel based on his attorney's failure to object to those errors. The state appellate court reviewed the former claim on direct appeal for plain error only, due to petitioner's failure to object at trial:

> Appellant[]... asserts that he did not receive the effective assistance of trial counsel, and was denied a fair trial because of repeated instances of improper admission or exclusion of evidence by the trial court.
>
> Addressing first the trial court's evidentiary rulings, we note that admission of evidence lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Renfro v. Black* (1990), 52 Ohio St.3d 27, 556 N.E.2d 150. The term "abuse of discretion" connotes more than a mere error of judgment; it implies a decision that is without any rational basis in law, and clearly wrong. *Angelkovski v.*

---

[6] Moreover, Fourth Amendment claims are not properly considered in federal habeas corpus proceedings, so long as the state courts provided "an opportunity for full and fair litigation" of that claim. *Stone v. Powell,* 428 U.S. 465, 494-95 (1976). In *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982), the United States Court of Appeals for the Sixth Circuit held that Ohio's mechanism for resolution of Fourth Amendment claims is clearly adequate. *Id.* Petitioner's claim regarding the alleged violation of state law fails to present an issue appropriate for federal habeas corpus relief. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988); *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Therefore, claim twelve cannot offer petitioner the relief that he seeks.

*Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 463 N.E.2d 1280.

Moreover, in those instances in which defense counsel failed to object to the state's presentation of evidence now cited as error on appeal, we must review the trial court's rulings under the additionally restrictive scrutiny of the plain error standard. Under Crim.R. 52(B), this court has the power to recognize "[p]lain error or defect involving substantial rights * * * although they were not brought to the attention of the court." However, this rule will only be invoked where it is shown that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus. "[T]he mere possibility that the jury might have reached a different conclusion is not sufficient to sustain the plain error standard." *State v. Carr* (Aug. 23, 2001), Franklin App. No. 00AP-1235. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long,* paragraph three of the syllabus.

Appellant's argument first addresses Detective Gillette's testimony that Robert Heltebrake had successfully passed a polygraph test, causing him to be cleared as a suspect. This testimony came in without objection. Detective Gillette also testified that Heltebrake denied any involvement with the incident and was elsewhere at the time. Both the alibi reference and the polygraph evidence, appellant asserts, constitute inadmissible and highly prejudicial hearsay evidence when introduced through Detective Gillette's courtroom testimony. Appellant also complains that Detective Gillette was also allowed to testify, without objection, to the content of a summary prepared by another detective who conducted the first interview with appellant on the day of the shooting. Detective Gillette also was asked to repeat statements by witnesses at the scene indicating that they had not seen a red car (which appellant asserted Heltebrake had been driving) anywhere in the area, and that the bystanders had, in fact, seen no one other than appellant at the scene. This also, appellant asserts, constituted impermissible, if unobjected, hearsay.

The prosecution generally asserts on appeal that all of the above hearsay was not offered to prove the truth of the matter asserted, but introduced solely to explain and develop the investigating detective's investigatory process and clarify the chronology of a rather lengthy investigation during which other suspects were ruled out and alternative theories discarded. This background information was necessary, the prosecution asserts, to place in context the multiple interviews with appellant and establish the course of inquiry that revealed the inherent inconsistencies of appellant's various accounts of his role in Kenny Sartin's death.

Accepting, *arguendo*, appellant's position that the testimony at issue went beyond mere background or introductory matters and should have been excluded as hearsay, we find upon the application of plain error standard that no plain error can be found. The prosecution's case in this matter rested partially upon circumstantial evidence: the presence of appellant at the scene, the chronology of his interaction with the victim in preceding hours, appellant's possession of a gun similar to that found in the car, and, most tellingly, the location and nature of the contact bullet wound behind the victim's right ear ruling out the kind of self-inflicted accidental wound claimed by appellant at one point in the investigation. The other essential aspect of the prosecution's case rested upon the multiple conflicting accounts given by appellant to investigating officers, with the concomitant effect upon appellant's credibility at trial. Neither of these theories were in any extraordinary measure dependent on exculpation of other specific suspects, but relied more upon the fact that appellant allegedly had inconsistently attributed blame to several other individuals, or had suggested an accident theory inconsistent with the nature and location of the wound. If timely objections and favorable evidentiary rulings had achieved the complete exclusion of any statements tending to clear Heltebrake in the case, it would not, on these facts, appear that the outcome of the matter would necessarily have been much affected. No plain error can be found in the admission of the statements complained of.

In addition to the hearsay evidence discussed, appellant also

asserts that improper opinion testimony was elicited. This included the detective's opinion that the investigation had succeeded in excluding other known persons as likely suspects. The detective also testified that the physical evidence contradicted appellant's account of the shooting, and that appellant's accounts were not corroborated by anyone else he had interviewed.

Generally, the comments focused on by appellant were elicited as background information during questioning, or were relatively peripheral to the substance of Detective Gillette's testimony. The most questionable element of this opinion testimony was the detective's statement that the physical evidence produced in the investigation contradicted appellant's version of the shooting. As appellant points out on appeal, the physical evidence gathered at the scene concerning the location of the body, nature of the gunshot wound inflicted, location of the firearm on the floor of the car, and the number of rounds fired, no more contradicted appellant's version of the shooting than it did the prosecution's. The prosecution also used such testimony to establish that Heltebrake's prints were not found at the scene, either on the gun or in the car, and that Heltebrake had passed a polygraph test. Nonetheless, the impact of such testimony by Detective Gillette, even if taken to be improper on the present facts is, again, difficult to evaluate as generating prejudice rising to the level of plain error. If Heltebrake were excluded on the basis of absence of fingerprints at the scene (having passed a lie detector test), then the absence of gunshot residue on appellant's hands and the absence of fingerprints on the gun would have tended also to convince the jury of appellant's innocence. As with the hearsay testimony, the ambivalent impact of this testimony makes it difficult to assess as prejudicial to the point of constituting plain error.

Appellant also asserts that the trial court committed plain error in allowing certain testimony by Brian Riegal, the polygraph examiner, regarding the reliability of the polygraph and thus its probative value. Specifically, the examiner concluded his testimony by opining that, as a result of his analyses of appellant's responses, "[m]y opinion is that he did pull the trigger and that he did kill Kenny Sartin." (Tr. 280.) No

objection was lodged as to this statement by the witness which was clearly beyond the scope of permissible testimony by a polygraph expert. However, the trial court did subsequently give the correct instruction regarding the polygraph evidence:

> The results of a polygraph examination have been admitted into evidence. The results obtained from the polygraph examination are not admitted to prove or disprove any element of the crime with which the Defendant is charged. Rather, the testimony is admitted to indicate [whether] at the time of the examination, the Defendant was not telling the truth. You may consider the testimony for purposes of testing the credibility of the Defendant.

(Tr. 444.)

Similarly, the prosecution in closing argument urged the jury to take the polygraph test results on exactly these terms:

> We had some testimony about a polygraph test. And I kind of just want to echo what Detective Gillette said. Because the reason why the polygraph test was submitted to you was because it's a tool, and I want you to use it as a tool. You can use it as a tool to judge the other evidence, to judge what this witness had said, whether or not he's lying. You know, if polygraph tests were, you know, the be all and end all of the truth, we would give everybody a polygraph test and we wouldn't use jurors.

(Tr. 405.)

A jury will be presumed to have followed the instructions of law given to it by the trial court. *Bell v. Mt. Sinai Med. Ctr.* (1994), 95 Ohio App.3d 590, 599, 643 N.E.2d 151. The trial court's instruction on the weight to be given to the polygraph evidence was correct, comprehensive, and clear and, in the present case, can be presumed to have overridden any

> objectionable or inadmissible statements by the polygraph
> examiner regarding appellant's guilt, particularly in light of the
> stress the prosecution itself placed upon the limited purposes
> of the polygraph evidence. We find no plain error in the
> polygrapher's conclusory statements.

*State v. Russell, supra,* 2004 WL 1109834. Petitioner has waived for federal habeas corpus

review claim eleven regarding errors to which no objection was made. *See Gulertekin v.*

*Tinnelman-Cooper,* 340 F.3d 415, 423-24 (6th Cir. 2003), citing *Hinkle v. Randle,* 271 F.3d 239,

244 (6th Cir. 2001); *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000); *Scott v. Mitchell,* 209

F.3d 854, 867 (6th Cir. 2000).

In claim nine, petitioner asserts that the trial court improperly denied his request for

grand jury transcripts; however, petitioner failed to file a timely appeal of the appellate

court's November 9, 2006, decision affirming the trial court's denial of his request. Instead,

on March 14, 2007, petitioner filed a motion for delayed appeal to the Ohio Supreme Court.

The Ohio Supreme Court denied that motion. *State v. Russell, supra*, 113 Ohio St.3d 1412.

Petitioner thereby waived this claim for federal habeas corpus review. *See Bonilla v. Hurley,*

*supra.*

In claim 11A, petitioner asserts that he was denied the effective assistance of counsel

because his attorney failed to raise on appeal a claim that the evidence was constitutionally

insufficient to sustain his conviction or against the manifest weight of the evidence.

Petitioner failed to present this claim to the state courts. Again, he may now no longer do

so under Ohio's doctrine of *res judicata. See State v. Cole, supra; State v. Ishmail, supra; State*

*v. Perry, supra.*

The Court deems the first and second parts of the *Maupin* test to have been met as to all of the foregoing claims. As to claims that petitioner failed to present to the state courts, the state courts were unable to enforce the procedural rules at issue due to the nature of petitioner's procedural default. As to those claims petitioner attempted to present in untimely or improper proceedings, the state appellate court explicitly enforced the procedural rules barring consideration of petitioner's claims as discussed above. Further, these procedural rules constitute adequate and independent bases upon which to foreclose review of these federal constitutional claims. *See Maupin v. Smith*, 785 F.2d at 138. The requirement that all available claims be raised at the first opportunity and within proper time limits serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.*

Accordingly, petitioner has waived his right to present claims one, 1A, 1B, 1C, two, 2B, 2C, three, 3A, 4A, 5A, 5B, 5C, six, seven, eight, nine, ten, eleven, 11A, twelve and 12A, for federal habeas review. He can still secure review of the merits of these claims if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges.

As cause for the procedural default of his on-the-record claims that he failed to raise on direct appeal, petitioner asserts the ineffective assistance of appellate counsel. *Traverse*,

at 15.  Petitioner complains that he had no input into the issues that appellate counsel raised on direct appeal.  He states that the only contact he had with his appellate counsel consisted of one phone call and several letters.  *Id.*, at 17.  Petitioner has attached, in support of this contention, a letter from his appellate attorney, John W. Keeling, dated July 2, 2003, which reads as follows:

> I have been assigned to represent you on your appeal.  An appeal is a review of your trial proceedings in order to ensure that they were conducted fairly.  It is not a new trial and we are not allowed to present new evidence or talk about anything that is not already part of the trial record.  I will have a transcript of all the trial testimony by the middle of August.  I will send you a copy.  After reviewing the transcript, I will file a brief setting forth our claim of errors.   This brief will probably be filed by mid September, unless we need an additional extension of time.
>
> Because I will have access to the entire record of your trial, I will have all the facts that I can use on appeal at my disposal.  Because we cannot argue or allude to facts that are not in the record, there is little factual information that you can provide me for purposes of your appeal.  However, there are other remedies for wrongs that cannot be addressed by appeal, so please let me know if you have any concerns or comments regarding the fairness of the proceedings against you.  We might have other remedies available.  You can call me collect.  My office will accept the call if I am in.  You are also free to write me or have anyone else contact me on your behalf.

*See Exhibits to Traverse.*  This letter does not support petitioner's allegation that counsel refused to discuss petitioner's appeal with him.

The ineffective assistance of counsel may constitute cause for petitioner's procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).  The record

indicates, however, that petitioner asserted in Rule 26(B) proceedings only that he had been denied the effective assistance of counsel because his attorney failed to raise on appeal a claim of ineffective assistance of trial counsel based upon his attorney's failure to move to suppress statements made by petitioner to Detective Gillette in violation of his *Miranda* rights, and a claim regarding the alleged improper admission of a letter written by petitioner. *See Exhibit 26 to Return of Writ.* Therefore, a claim of ineffective assistance of counsel cannot constitute cause for the procedural default of any of petitioner's claims, with the exception of claim 2B (in which he asserts that he was denied a fair trial by the admission of his letter).

As cause for his failure to raise additional claims of ineffective assistance of appellate counsel in Rule 26(B) proceedings, petitioner argues that he is a layman with no training in legal matters, and that he lacked sufficient time to review his trial transcripts and conduct legal research. *Traverse*, at 20. According to petitioner, he did not receive a copy of his trial transcripts from appellate counsel until June 10, 2004, and had only 57 days to review the transcripts before his Rule 26(B) application was due.[7] *Id.*, at 21. Additionally, petitioner asserts that the prison's law library was not open as frequently as it should have been, that he had no access to law books in his prison cell, and that he was unable to obtain the assistance of a law clerk when the library was closed. Petitioner also states that his housing unit was on lock down status at different times for different reasons

---

[7] Petitioner has attached a June 7, 2004, letter from Attorney Keeling indicating that Keeling had mailed the trial transcript to petitioner pursuant to petitioner's request. *See Exhibits to Traverse*.

during the period when he was working on his Rule 26(B) application. Petitioner states that he was "stuck between a rock and a hard place, due to circumstances beyond [his] control," so he filed a timely but incomplete Rule 26(B) application on August 6, 2004. *See Exhibit 26 to Return of Writ; Traverse,* at 24. In support of these allegations, petitioner has attached his own affidavit, as well as the affidavit of Jeffrey L. Bailey, who avers that he was a law clerk at the Ross Correctional Institution's law library during the summer of 2004 and that, during that time, there were days on which the law library was scheduled to be open to the general population but was not. *Affidavit, Jeffrey L. Bailey, Exhibits to Traverse.*

> Also during that time, there were mornings when the entire compound was on lock down status due to fog....
>
> Also during that time, there were days when housing unit 4A, 4B were on lock down status, due to fights or other situations.
>
> Also during that time, whenever the law library was open inmate Russell... was making use of it, there were times when I would give him the books he asked for.

*See id.* Petitioner has attached similar affidavits from other inmates, *i.e.*, Keith Lomax, Harry Pierce, Roger Gonzalez, *see Exhibits to Traverse.* Upon review of the record, however, this Court concludes that petitioner has failed to establish cause for his failure to raise additional claims of ineffective assistance of counsel in his Rule 26(B) proceedings.

As noted, appellate counsel advised petitioner in July 2003 that his trial transcripts would be available by the middle of August 2003. There is nothing in the record to suggest that any objective factor outside petitioner's control prevented him from requesting or

36

obtaining a copy of his transcripts prior to June 2004. Further, petitioner filed his Rule 26(B) application on August 6, 2004. The record does not indicate that petitioner made any attempt thereafter to amend his Rule 26(B) application to include any additional claims, although on September 15, 2004, he filed a reply to the State's responsive brief. *See Exhibit 28 to Return of Writ.*

> "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule."

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003), citing *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). Petitioner has failed to meet this standard here. His *pro se* incarcerated status, limited access to the prison law library, or ignorance of the law simply fail to establish cause sufficient to excuse his procedural default. *See Bonilla v. Hurley*, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).

Petitioner also argues the ineffective assistance of appellate counsel as cause for his failure to preserve for federal habeas review a claim based on trial counsel's failure to proffer into evidence a letter written by petitioner to the victim's mother. The state appellate court rejected this claim as follows:

> Appellant also argues that trial counsel allowed the court to admit as evidence a letter written by appellant to the victim's mother which tended to demonstrate appellant's culpability, while not admitting a second letter written by appellant which, appellant now claims, tended to rebut the admission of guilt from the first letter
>
> ***

Appellant's ... proposed assignment of error asserts that the trial court erred in admitting one of two letters written by appellant in the prosecution's case-in-chief, yet declined to admit a second exculpatory letter, and that appellate counsel should have raised this alleged error by the trial court upon appeal.

The letter admitted by the trial court was properly admitted under Evid.R. 801(D)(2) as an admission by a party-opponent. It was accordingly not excludable as hearsay. The trial court declined to admit a second letter written by appellant on the basis that it was offered by appellant himself and was inadmissible hearsay. Appellant was an available witness (he testified on his own behalf) and the proffered letter was consistent with his testimony. It thus was an out-of-court statement not covered by any exceptions to the hearsay rule. Appellant advances no grounds upon which the trial court would not have been justified in excluding this letter as hearsay, or any exception to the hearsay rule that would allow admission of the letter when appellant was available to testify. Appellant's counsel therefore was not ineffective for failing to raise this argument, . . .

*Exhibit 29 to Return of Writ.*

The factual findings of the state appellate court are presumed to be correct:

(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254(e). Further, federal habeas corpus relief is warranted only where the state court's decision was contrary to or involved an unreasonable application of federal law or resulted in an unreasonable determination of the facts in light of the evidence presented:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner. *Id.* at 413, 120 S.Ct. 1495.

*Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005). Petitioner has failed to establish that the state appellate court's decision denying this claim is so unreasonable as to justify federal habeas corpus review. *See Williams v. Taylor, supra.*

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was

deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

A defendant has a right to effective counsel as to his first appeal of right. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985). But not every nonfrivolous claim need be raised on direct appeal. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The ability to single out weaker arguments on appeal is a sign of effective appellate advocacy. *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). The ignored issues must be stronger than those presented, in order to overcome the presumption of effective assistance of counsel.

*Monzo v. Edwards,* 281 F.3d 568, 579 (6th Cir. 2002).

*Jalowiec v. Bradshaw*, 2008 WL 312655 (N.D. Ohio January 31, 2008).

Contents of a letter petitioner wrote to the victim's mother were admitted into evidence.  In that letter, petitioner said that he was "deeply sorry about what happened," that he had been a friend to Kenny and "didn't [kill him] on purpose, it was an accident." *Transcript,* at 228.  The Ohio Court of Appeals concluded that petitioner's statement was admissible under Ohio Rule of Evidence 801(d)(2), which provides:

> Statements which are not hearsay. A statement is not hearsay if:
>
> ***
>
> (2) Admission by party-opponent. The statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity, . . .

The record does not indicate that the state appellate court's conclusion was erroneous. Therefore, defense counsel did not act in a constitutionally unreasonable manner in failing to object to the admission of this letter.  Further, petitioner testified at trial that he wrote that letter in September 2002 on the advice of his attorney who stated that, unless the victim's death was accidental, petitioner would end up spending the rest of his life in jail. *Transcript,* at 375-76.

> My attorney told me to say, the only way that I was ever going to get out of jail was to say it was an accident, and that's why I did it.  And up until that time, up until September 2992, I never, ever, ever said that I did it.  But it was coming close to

> my court dates and that's why I did it, because I didn't want to
> go for the rest of my life for something I didn't do.

*Id.*, at 376.  Petitioner apparently wrote a second letter to Mrs. Sartin, in which he told her

that his prior letter was not accurate, and that he had not killed Kenny, even by accident.

*Id.*, at 381.  That letter was not introduced into evidence at petitioner's trial, but

petitioner testified about that letter:

> I wrote two letters.  The second letter I explained to her why I
> wrote the first one, because I was advised if I didn't say that it
> was an accident, that I would never get out of jail.  So then I
> wrote the second one explaining that to her.  That is why I
> wrote, I'm not the one that killed Kenny, I'm not the one that
> killed him.  But I didn't want to go to jail for the rest of my life.
>
> Q.  Did you tell that to her in the second letter?
>
> A.  Yes, sir.

*Id.*, at 383-84.  Because petitioner testified regarding the contents of his second letter, and

explained the reasons for his first letter, he likewise cannot establish prejudice under

*Strickland* based upon his trial attorney's failure to proffer the second letter into evidence

or his appellate attorney's failure to raise that issue on appeal.  Petitioner has therefore

failed to establish cause for his procedural default of claim 2B; his claim of ineffective

assistance of counsel, as presented in claim 2A, is without merit.

As cause for his untimely post conviction petition, petitioner again asserts that he

did not obtain a copy of his trial transcript in time to file a timely post conviction petition.

Petitioner also argues that, because he was still represented by trial counsel (in proceedings

on his first motion for a new trial), he did not want to raise an issue of ineffective assistance of trial counsel at the time his post conviction petition was due. Petitioner also argues that his appellate attorney led him to believe that the attorney would file a post conviction petition on his behalf because counsel's July 2003 letter relating to petitioner's direct appeal also stated, "there are other remedies for wrongs that cannot be addressed by appeal, so please let me know if you have any concerns or comments regarding the fairness of the proceedings against you. We might have other remedies available." *See Exhibits to Traverse; Traverse*, at 32. According to petitioner, he did not learn until early October 2004, *i.e.,* after the time for filing a timely post conviction petition had expired, that appellate counsel would not be filing a post conviction petition on his behalf. *Traverse*, at 32. [8]

These arguments are not persuasive. As discussed, the record fails to support petitioner's contention that he could not have obtained a copy of his trial transcript in 2003, and long before his post conviction petition was due, on February 7, 2004. *See State v. Russell, supra*, 2006 WL 225278. The record also fails to support petitioner's contention that appellate counsel suggested that he would pursue post conviction proceedings on petitioner's behalf. Further, this Court is not persuaded that his trial counsel's continued

---

[8] Petitioner specifically refers to a letter dated October 1, 2004, wherein his appellate attorney, John W. Keeling, wrote:

> I am now withdrawing as your attorney. I no longer represent you in any capacity. If you wish to seek any additional remedies, you will have to make arrangements for appointed counsel or retain your own.

*See Exhibits to Traverse.*

representation of petitioner in proceedings on his motion for a new trial prevented

petitioner from raising any claims in a timely post conviction petition. In short, nothing in

the record demonstrates that any "objective factor external to the defense" impeded

petitioner's ability to present his off the record claims to the state courts in a timely manner.

*See Maples v. Stegall, supra,* 340 F.3d at 438.

As cause for his failure to preserve at trial the claims presented in claim eleven,

which address certain evidentiary rulings and which were reviewed on appeal only for

plain error, petitioner again asserts the ineffective assistance of counsel. The state appellate

court rejected this claim as follows:

> [W]e turn to appellant's contention that he did not receive
> effective assistance of trial counsel, which is based largely
> upon the failure to object to the hearsay or opinion testimony
> outlined above. In order to establish a claim of ineffective
> assistance of counsel, a defendant must first demonstrate that
> his trial counsel's performance was so deficient that it was
> unreasonable under prevailing professional norms. *Strickland
> v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80
> L.Ed.2d 674. The defendant must then establish that "there is
> a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different.
> A reasonable probability is a probability sufficient to
> undermine confidence in the outcome." *Id.* at 694.

> * * * A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from counsel's
> perspective at the time. Because of the difficulties inherent in
> making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id*. at 689, citing *Michel v. Louisiana* (1955), 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83.

A verdict adverse to a criminal defendant is not necessarily indicative that he received ineffective assistance of counsel. *State v. Hester* (1976), 45 Ohio St.2d 71, 75, 341 N.E.2d 304.

If we aggregate the testimony alleged as erroneously admitted in the present case, we can find, first, no unprofessional error on the part of trial counsel in choosing the course of the defense, and second, no actual prejudice to appellant in failing to object to the specific evidence raised in this appeal. Even accepting that trial counsel's failure to object to the opinion testimony and hearsay testimony could not be justified on tactical grounds, we find that there is no reasonable probability that, but for the failure to object, the results of the proceeding would have been different. We accordingly find that appellant was not denied the effective assistance of trial counsel.

*State v. Russell, supra*, 2004 WL 1109834. Again, the decision of the state appellate court is presumed to be correct. 28 U.S.C. §2254(d), (e); *Williams v. Taylor, supra*. Upon review of the entire record, and upon consideration of the evidence pointing to petitioner's guilt, this Court is unable to conclude that the state appellate court's decision rejecting petitioner's claim of ineffective assistance of either trial or appellate counsel in this regard is unreasonable so as to justify federal habeas corpus relief.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the

conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491; *see also*

*Sawyer v. Whitley,* 505 U.S. 333. Petitioner asserts that he is actually innocent of the charges

against him. Petitioner acknowledges that he cannot present any new evidence of actual

innocence, but nonetheless argues at length that the evidence actually presented at trial

establishes his innocence of the murder of Kenny Sartin. In this regard, petitioner refers

to negative results of a gunshot residue test conducted by police within an hour of the

shooting, *see Transcript*, at 210-11,[9] and the lack of evidence that he was seen with blood,

blood splatter or blow back on his hands or clothing at the time that Kenny Sartin was

found dead. *Traverse*, at 27. Petitioner also notes that he was initially released from

custody and was arrested only 14 months later. Finally, petitioner points out that, although

the prosecutor or police had represented during the early stages of the prosecution that a

witness asserted that petitioner had confessed to the crimes charged, no such individual

testified against him at trial or was disclosed in discovery. *See Exhibits to Traverse; Traverse,*

at 27-28.[10] However, the record fails to demonstrate evidence of actual innocence sufficient

---

[9] On cross-examination, Detective Gillette confirmed that a gunshot residue test had been performed on petitioner's hands, and that the results were negative for gunshot residue. *Transcript*, at 210. On re-direct examination, Gillette stated that not every person who fires a weapon will test positive for gunshot residue. *Id.*, at 231.

[10] Petitioner refers to "Police Summary 58," which indicates in relevant part:

Detective Seamans advised Mr. Russell "the reason charges were filed on you tonight is because of some new evidence and this evidence nails you." ...

I asked Mr. Russell, "how do you know we got anything from anybody?" Mark Russell stated "you got new evidence." I immediately told Mark we

to warrant a merits review of petitioner's otherwise procedurally defaulted claims.

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 115 S.Ct. 851. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115 S.Ct. 851. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321, 115 S.Ct. 851.

*Souter v. Jones*, 395 F.3d 577, 589-90 (6th Cir. 2005)(footnote omitted). Petitioner has simply

failed to meet this standard here.

## CLAIM FIVE

In claim five, petitioner asserts that he was denied a fair trial because the trial court

---

have new evidence and that's all we said....

*See Exhibits to Traverse*.

refused to admit into evidence tape recorded interviews between petitioner and police.

The state appellate court rejected this claim as follows:

> Appellant[]... asserts that the trial court erred in refusing to allow into evidence the recorded police interviews of appellant. The trial court excluded the tapes as hearsay. The trial court found that, since both appellant and Detective Gillette had testified, their testimony constituted the best evidence of the conversations, and the tapes represented an impermissible effort to use out-of-court statements to bolster appellant's in-court testimony. Counsel for appellant asserted at trial, and asserts again on appeal, that this basis for excluding the tapes evaporated once the state presented the testimony of Detective Gillette, which opened the door for the defense to introduce rebuttal evidence.
>
> The videotapes and audiotapes in question have been supplied as part of the record before the court in this appeal. A close review of the contents of these tapes leads us to conclude that we need not reach the correctness of the trial court's evidentiary ruling in excluding the tapes, because our review shows no prejudice can have devolved to appellant therefrom. The tapes are substantially consistent with Detective Gillette's description of their contents and particularly with respect to the audiotapes, any inconsistencies between appellant's account of the interview and Detective Gillette's account are explained by Detective Gillette's explanation and interpretation of the occasional use of nods or hand gestures to communicate by appellant. Admission of the tapes into evidence would have done nothing to either discredit Detective Gillette's testimony or bolster that of appellant, and no prejudicial error could be found on the part of the trial court, if error were found at all. Appellant's first assignment of error is accordingly overruled.

*State v. Russell, supra*, 2004 WL 1109834. Petitioner complains that these factual findings of the state appellate court are incorrect, *see Traverse*, at 50-53; however, the record fails to reflect any reason to disturb the state appellate court's findings here. 28 U.S.C. §2254(e).

Further, federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke*, 916 F.2d 329, 335 (6th cir. 1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). The record fails to reflect that such are the circumstances here.

Claim five is without merit.

## CLAIM FOUR

In claim four, petitioner asserts that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim that his statements to police on November 27, 2000, and January 19, 2001, were improperly admitted at trial due to police failure to comply with *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Memorandum in Support of Petition*, at 55-63.

Respondent contends that this claim has been waived due to petitioner's failure to present his ineffective assistance of counsel claim to the state appellate court in his Rule 26(B) application as a federal constitutional issue. *Return of Writ*, at 29.

In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir. 1986).

Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears self-evident. *Haggins v. Warden*, 715 F.2d 1050, 1054 (6th Cir. 1983)(citing *Harless*, 459 U.S. at 6). Furthermore, "[a] petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984). Petitioner, however, need not "cite book and verse on the federal constitution." *Picard*, 404 U.S. at 277 (quoting *Daugharty v.Gladden*, 257 F.2d 750, 758 (9th Cir. 1960)). The Sixth Circuit has strictly followed the requirement that petitioner fairly presented his federal constitutional claims to the state courts as a precondition to federal habeas review. *Weaver v. Foltz*, 888 F.2d 1097, 1098 (6th Cir. 1989).

This Court is not persuaded by respondent's argument. Although petitioner did not refer to *Strickland* (or to any state cases relying on *Strickland*) in his initial Rule 26(B) application, he asserted that he had been denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. *See Exhibit 26 to Return of Writ.* The State responded to this federal constitutional claim. *See Exhibit 27 to Return ofWrit.* Additionally, petitioner properly referred to *Strickland* in his response brief. *Exhibit 28 to Return of Writ*. The state appellate court likewise reviewed the claim as one of

50

constitutional magnitude.  *See Exhibit 29 to Return of Writ.*  This Court, therefore, will likewise consider petitioner's federal claim of ineffective assistance of counsel.

Petitioner contends that Detective Gillette was improperly permitted to testify regarding his conversations with petitioner on November 27, 2000, and January 19, 2001. *See Transcripts*, at 187-191; 196-198.  Gillette testified that, on November 27, 2000, he met petitioner at a restaurant because petitioner had called police indicating that he wanted to talk to the detective about the murder.  *Id.*, at 187-188.  At that time, petitioner did not want to take a polygraph examination because, he said, he would not pass.  *Id.*, at 188.  He told Gillette that he had not killed Kenny Sartin and that it was Mook, also known as Jesse Lanier, who was responsible.  *Id.*, at 190.  On January 19, 2001, Detective Gillette met with petitioner, at petitioner's home.  *Id.*, at 196.  At that time, petitioner told Detective Gillette that it was Marchello Cox who had killed Sartin.  *Id.*, at 197-98.  Petitioner contends that he was in custody during both of these interviews and that police should therefore have administered warnings under *Miranda* prior to questioning petitioner.  He also complains that the detective failed to record the interviews.  Additionally, petitioner states he had only called the detective in response to many messages left by the detective.  *See Memorandum in Support of Petition*, at 55-63.

The state appellate court rejected petitioner's claim in relevant part as follows:

> Appellant argues that appellate counsel was ineffective in his direct appeal because appellate counsel failed to raise as an issue the alleged ineffectiveness of trial counsel, who failed to object to the admission of, or file a motion to suppress, two summaries of interviews with appellant by an investigating detective.  Appellant clams that the summaries were

inadmissible because the detective did not administer appellant his *Miranda* rights prior to the conversation. .

With respect to admission of summaries of statements made by appellant in police interviews, the reports and summaries of the interviews are found in the record of the case and were reviewed by this court. Both interviews appear to have taken place in a non-custodial setting, one in appellant's home, and one that was initiated by a phone call made by appellant to the investigating detective. There is nothing in the record that would support a conclusion that a motion to suppress either summary would have succeeded based upon the non-administration of appellant's *Miranda* rights. Appellate counsel is not required to assign and argue error that has little chance of succeeding or would distract from more meritorious arguments.... We accordingly find that appellate counsel's choice not to raise this issue in the initial appeal does not demonstrate that appellate counsel was ineffective, and appellant's first proposed assignment of error does not have merit.

*Exhibit 29 to Return of Writ.* Again, the record fails to reflect that the state court's decision is unreasonable so as to warrant federal habeas corpus relief. 28 U.S.C. §2254(d), (e); *Williams v. Taylor, supra.*

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona, supra,* 384 U.S. at 444. A person being questioned while in custodial interrogation must be warned "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence

52

of an attorney, either retained or appointed." *Id.* "Where a defendant makes a voluntary statement without being interrogated or pressured by an interrogator … the statements are admissible despite the absence of *Miranda* warnings." *United States v. Legette,* 2007 WL 1796230 (E.D. Michigan June 20, 2007), citing *United States v. Murphy,* 107 F.3d 1199, 1204 (6th Cir. 1997) (citing *Miranda v. Arizona,* 384 U.S. 436). Law enforcement officers

> must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation until such time as the defendant reinitiates communication or counsel is made available. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

*Zaffino v. Konteh,* 2006 WL 2360902 (N.D.Ohio August 15, 2006). However,

> *Miranda* warnings are necessary only when the accused is interrogated while in custody, not simply when he is the focus of an investigation. Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " [*People v. Herndon,* 246 Mich.App. 371, 395, 633 N.W.2d 376 (2001) (footnotes omitted)].

*Fields v. Howe,* 2009 WL 304751 (E.D. Michigan February 9, 2009). Under clearly established Supreme Court precedent, whether a person is in custody and thereafter entitled to *Miranda* warnings depends on "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006), citing *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)); *see also Thompson v. Keohane,* 516 U.S. 99, 112 (1995) ("[W]ould a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]").

53

> "Custody for *Miranda* purposes has been ... narrowly circumscribed." *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). As the Court explained in *Miranda*, an interrogation is custodial only where the suspect "has been taken into custody or otherwise deprived of is freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, although a court must consider the totality of the circumstances surrounding the interrogation, the ultimate inquiry is whether there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 430 (internal quotation omitted); *see also, Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam); *Beheler*, 463 U.S. at 1125. The ultimate question is not the suspect's subjective belief, but how a "reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

*Thompson v. Trombley*, 2008 WL 4427790 (E.D. Michigan September 30, 2008). Nothing in the record suggests that petitioner was in custody at the time that he made these statements; his attorneys' failure to challenge the admission of those statements into evidence does not, therefore entitled petitioner to habeas relief. *See Williams v. Taylor, supra.*

Claim four is without merit.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo*

determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

May 29, 2009        _s/Norah McCann King_

                                        Norah McCann King
                                        United States Magistrate Judge